Appeal No. 16-8024

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

**MICHAEL DRIVER, TERRY CLAYTON, MICHAEL BOYD,
NICHOLAS SWORDS, and, ROY SHOFNER,**
individually and on behalf of all others similarly situated,
Plaintiffs – Petitioners
v.

**THE MARION COUNTY SHERIFF, and,
THE CONSOLIDATED CITY OF INDIANAPOLIS AND MARION COUNTY**
Defendants – Respondents

On Petition for Permission to Appeal from the
U.S. District Court, Southern District of Indiana, Indianapolis Division,
Case No. 1:14-cv-2076-RLY-MJD
Honorable Richard L. Young, Judge

**DEFENDANTS-RESPONDENTS' OPPOSITION TO PLAINTIFFS' FED. R. CIV. P 23(f)
PETITION FOR PERMISSION TO APPEAL**

Anthony W. Overholt
FROST BROWN TODD LLC
201 North Illinois Street, Suite 1900
P.O. Box 44961
Indianapolis, IN  46244-0961
317-237-3800
Fax: 317-237-3900
aoverholt@fbtlaw.com

Attorneys for  Defendants – Respondents,
Marion County Sheriff and The Consolidated
City of Indianapolis and Marion County

## Table of Contents

                                                                                                Page

Introduction .................................................................................................................1

Statement of Facts and Proceedings Below ...........................................................2

    A.    Marion County Court's Case Management System.........................................2

    B.    The Marion County Courts decided to replace JUSTIS with the Odyssey case management system and set a timetable for Odyssey's implementation. .......................2

    C.    The MCSO, based upon advice from ISA and the Courts' IT staff, replaced JIMS with OMS. ...................................................................2

    D.    The stakeholders work collaboratively to prepare for the Odyssey launch date of June 1, 2014, and employees are trained on the new system. Only after Odyssey's launch, the stakeholders learn that the new system designed to replace JUSTIS does not work as well as planned. ...........................3

    E.    Some release delays are due to human error. Determining whether an employee of one of the Defendants is responsible for an error is complicated by the fact that court employees sometimes backdate records..........................4

    F.    Determining responsibility for a delayed release requires an individualized review of an inmate's specific circumstances affecting his specific release decision. ...................................................................5

    G.    Plaintiffs presented no admissible evidence that the Sheriff had a policy of holding all inmates for a period of 72 hours after a court orders an inmate's release. ...................................................................6

Argument...................................................................................................................7

    A.    Standard of Review....................................................................7

    B.    The United States Supreme Court established a bright-line test for over-detention claims that generally bars class action claims alleging delays in processing inmates for release from jail. ...................8

    C.    This Court's decisions involving over-detention claims foreclose Plaintiffs' request for class certification in this case..........................10

        1.    This Court's precedents have applied McLaughlin to cases such as this one. ...................................................................10

        2.    This Court's decisions in Harper and Portis show why class certification is inappropriate in this case. ...........................11

        3.    The district court properly interpreted McLaughlin as a general bar to Plaintiffs' request for class certification and that interpretation is consistent with this Court's decisions in Harper and Portis. ...........................12

D.    Plaintiffs cannot shoehorn their class claims into the narrow exception for class actions where the length of inmate detentions are at issue. ...........................................14

E.    The district court correctly denied class certification on the claim that the Defendants utilized a computer system that was unable to timely process inmates for release. .........................................................................................16

    1.    Class certification was properly denied because Plaintiffs did not present evidence sufficient to establish the existence of an unconstitutional policy or practice. ....................................................17

    2.    Even if this Court determines that the decision to move to Odyssey and OMS amounted to a custom or policy under Monell, Plaintiffs failed to present sufficient evidence of intent. ..................................................19

Conclusion ......................................................................................................................20

## Table of Authorities

Page

**Cases**

*Atwater v. City of Lago Vista*, 532 U.S. 318 (2001) .......................................................... 10

*Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832 (7th Cir. 1999) ....................................... 7

*Bostic v. City of Chicago*, 981 F.2d 965 (7th Cir. 1992) .................................................... 11

*Chortek v. City of Milwaukee*, 356 F.3d 740 (7th Cir. 2004)............................................ 10

*City of Oklahoma City v. Tuttle*, 471 U.S. 808 (1985) ....................................................... 17

*County of Riverside v. McLaughlin*, 500 U.S. 44 (1991) ...................................... 9, 10, 12, 13

*Davis v. Hutchins*, 321 F.3d 641 (7th Cir. 2003)............................................................... 15

*Dunn v. City of Chicago*, 231 F.R.D. 367 (N.D. Ill. 2005) ............................................... 12

*Gerstein v. Pugh*, 420 U.S. 103 (1975) ............................................................................ 8, 9

*Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432 (7th Cir. 1986).................................... 12

*Harper v. Sheriff of Cook County*, 581 F.3d 511 (7th Cir. 2009) ....................................... 11

*Hvorcik v. Sheahan*, 847 F.Supp. 1414 (N.D. Ill. 1994)................................................... 17

*Lewis v. Anderson*, 308 F.3d 768 (7th Cir. 2002) ............................................................. 19

*Lewis v. O'Grady*, 853 F.2d 1366 (7th Cir. 1988) ........................................................... 11

*Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986) ......................................................... 15

*Portis v. City of Chicago*, 613 F.3d 702 (7th Cir. 2010) ............................................. 11, 14

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011) ...................................................... 15

**Introduction**

Plaintiffs challenge the decision by the district court which, in part, rejected their bid for class certification under Fed. R. Civ. P. 23(b)(3).[1]  Plaintiffs claim that they, and an undetermined number of other inmates, were detained for an unreasonable time in the Marion County Jail after a court ordered their releases.  These complaints about processing delays are the foundation of Plaintiffs' claims.

This Court has repeatedly held that class actions are improper vehicles for claims where inmates contend that it took too long to release them from custody after a judicial release decision was made because individualized assessments of the reasons for delay in each case are necessary. Individualized determinations about how long each inmate detention was, what caused it, and what person or entity was responsible, are necessary to determine liability. While some inmates may have been detained longer than others, each individual inmate's situation must be reviewed to determine the cause of the delay and to decide whether the Defendants or employees of the Marion Superior Courts—non-parties to this case—are responsible for those over-detentions. Because individualized questions predominate over any common questions, class certification is inappropriate.

This Court's decisions that over-detentions cannot be challenged on a class basis follow a decision from the United States Supreme Court that held local governments are generally immune from class-action challenges where inmates claim that processing times for release are too long and result in over-detentions.  Therefore, the district court was well within its discretion in denying class certification, and this Court should affirm that decision.

---

[1] The district court certified two of the subclasses sought by the Plaintiffs. Those decisions are not challenged by Defendants in this response.

**Statement of Facts and Proceedings Below**

### A. Marion County Court's Case Management System

For many years in Marion County, the criminal courts used a system called "JUSTIS" to manage criminal case dockets. JUSTIS was a DOS-based system developed exclusively for use in Marion County. (Dkt. 119, Declaration of Derek Peterson, ¶ 4.)

Other criminal justice agencies in Marion County either relied on JUSTIS directly or had computer systems that were fully integrated with JUSTIS so that information sharing between the Courts and these other agencies was a virtually seamless process.  Those other agencies or "stakeholders" were the Indianapolis Metropolitan Police Department, the Marion County Sheriff's Office, the Public Defender's Office, Community Corrections, and the Prosecutor's Office.  (*Id.*, ¶ 5.)

### B. The Marion County Courts decided to replace JUSTIS with the Odyssey case management system and set a timetable for Odyssey's implementation.

The Indiana Supreme Court has been working for several years to bring an electronic case management system to courts across Indiana. (*Id.*, ¶ 8.)  The Marion Superior Courts, through its Executive Committee, decided that it would replace JUSTIS with the Odyssey case management system. It made that decision to use Odyssey for the criminal courts in 2013. When the Executive Committee decided to move to Odyssey, it anticipated that Odyssey would "go live" in Marion County in 2016, approximately three years later. (*Id.*, ¶ 8.)  Later, however, the Courts accelerated implementation and required Odyssey to be in place by June 1, 2014. (*Id.*, ¶ 9.)

### C. The MCSO, based upon advice from ISA and the Courts' IT staff, replaced JIMS with OMS.

The MCSO's Jail Information Management System ("JIMS") needed replacing as well. The MCSO consulted with ISA and the Courts. Based upon those discussions, the MCSO chose OMS

("Offender Management System"). (*Id.*, ¶¶ 11-14.)     Before moving to OMS, a "gap analysis" was performed to determine the functional differences (or "gaps") between JIMS and OMS and to determine whether OMS would be an adequate replacement for JIMS.   (Supp. App. at 12, Deposition of Derek Peterson, at p. 26.)[2]

>    **D. The stakeholders work collaboratively to prepare for the Odyssey launch date of June 1, 2014, and employees are trained on the new system. Only after Odyssey's launch, the stakeholders learn that the new system designed to replace JUSTIS does not work as well as planned.**

The stakeholders met regularly to prepare for Odyssey's launch. (Dkt. 119, ¶ 14.) To prepare for the launch, the MCSO extensively trained its employees in Inmate Records on the new system and updates to that system.  (Dkt. 121, ¶ 9; Supp. App., 18-19, Deposition of T. Wood, 77:2-25; 78:1-12.)

One significant part of the process to replace JUSTIS with Odyssey involved ISA's development of DEXTER. DEXTER was to serve as a computerized transfer system that would allow the various computer programs used by the stakeholders to exchange information with each other and with Odyssey. (Dkt. 119, Peterson Dec., ¶ 13.)

After Odyssey went live on June 1, 2014 and JUSTIS was deactivated, the stakeholders began to realize that there were problems with the new system. (*Id.*, ¶ 14.) For purposes of the class certification issues now before this Court, the problems involved timely information being received by the MCSO from the Courts and other agencies in order to make release decisions.

---

[2] Many depositions were taken after Defendants filed their opposition to class certification. Several of those depositions are cited by the Plaintiffs in their reply in support of class certification and in the petition to appeal.  Because the district court ruled on class certification before Defendants had the opportunity to file their sur-reply based upon this new evidence, this response is Defendants' first opportunity to address the issues raised by those depositions.  Any evidence relied upon by the Defendants not located in their district court filings is contained in the attached supplemental appendix.

The stakeholders anticipated and attempted to address one issue just before Odyssey went live. (Dkt. 171, p. 11.) ISA notified the stakeholders that the interface from DEXTER to OMS was not complete, and that the Sheriff's Office would not receive electronic court information when the new system went live. Immediately, the Courts began working with the Sheriff's Office to develop workarounds to ensure the Sheriff received as much information as possible so that release decisions could continue being made. This required the Sheriff to rely upon automated reports sent from the Courts on an hourly basis that listed all of the event codes entered, regardless of an inmate's custody status. Those codes were then manually processed in the Sheriff's Office. The Sheriff's Office also received multiple telephone calls, emails, and faxes with directives from the Court that were also manually updated in OMS, thus sometimes increasing the amount of time it took to process an inmate for release. (Dkt. 119, ¶ 14; Dkt. 171, p. 11.)

**E. Some release delays are due to human error. Determining whether an employee of one of the Defendants is responsible for an error is complicated by the fact that court employees sometimes backdate records.**

Delays were (and still can be) the result of human error. In Odyssey, release decisions are driven by event codes and sentencing orders. For example, an "ORC" code will inform the Sheriff's staff that an inmate is eligible for release on a particular case. (Dkt. 119, ¶ 19.) Therefore, if the Courts' employee responsible for entering the ORC makes an error by entering the wrong code or delays in entering the code, the Sheriff's Office will not be informed that an inmate should be processed for release. Coding errors can be made by employees of the Courts, the Sheriff, or the Clerk. These sorts of errors sometimes result in release delays in individual cases. (Dkt. 119, ¶ 19.)

Sheriff's employees have also identified instances where court staffs have failed to timely enter the proper code resulting in release delays and then attempted to "backdate" computer

entries. The backdating of entries can make it appear that the failure to timely release an inmate was due to an error by the Sheriff's staff, rather than the Court's staff. (*Id.*, ¶ 20.) The Defendants are unaware of how widespread this problem is because determining the severity of the problem would involve reviewing case files for each individual inmate.

**F.  Determining responsibility for a delayed release requires an individualized review of an inmate's specific circumstances affecting his specific release decision.**

The issue of backdating further complicates what is already a time consuming process to determine whether an inmate was actually detained longer than permitted by law and where responsibility for the detention may lie. The Defendants know of no way to determine whether a particular inmate has been over-detained other than conducting an individual review of each inmate's individual detention situation. That involves, in part, reviewing the inmate's offender packet, any information contained in Odyssey and OMS, and conducting searches of e-mails and automated reports with data relating to the individual. That process will generally take at least an hour for each inmate and in some instances may take even longer. (Dkt. 119, ¶ 21.)

An inmate's use of one or more aliases can extend (sometimes considerably) the release process. Staffing shortages, jail emergencies, and other issues may also play a role in release delays in particular cases. For example, there have been instances since July 2014 where internet and data exchange outages have caused processing delays of several hours. (Dkt. 121, ¶¶ 5, 22.) Release processing generally takes 9 hours currently. (Dkt. 118, Declaration of James Martin, ¶¶ 5-7.)

**G. Plaintiffs presented no admissible evidence that the Sheriff had a policy of holding all inmates for a period of 72 hours after a court orders an inmate's release.**

Plaintiffs complain that the Sheriff had a policy, practice, or custom of allowing Jail staff to hold inmates for up to 72 hours before releasing them. No such policy exists, and the evidence demonstrates it never existed.

Plaintiffs base this claim upon statements supposedly made by unnamed, line-level employees of the MCSO who reportedly told inmates or their families that the MCSO has carte blanche authority to hold inmates for this lengthy period. But Plaintiffs have not identified a single Sheriff's employee who testified that they actually said it.

Moreover, the MCSO's written policies directly contradict Plaintiffs' claims. The Sheriff—who is the final policymaking authority for the MCSO—put in writing the MCSO's policy in a directive issued to all employees after this lawsuit was filed, and he learned about Plaintiffs' claims of a seventy-two-hour policy. That directive stated:

> To all staff:
>
> It has come to my attention that there is a rumor that jail inmates can be held up to 72 hours after the date that they have been ordered to be released to the street. That rumor is false. Inmates must be processed for release in a timely manner, and the Sheriff's Office does not have 72 (hours) to process inmates for release. It is not, nor has it ever been, a policy of the Sheriff's Office to process inmates within a 72 hour window.

(Dkt., 120, Declaration of Louis Dezelan.)

The evidence also shows that inmates may have incorrectly believed the MCSO had some sort of seventy-two-hour hold policy because of the Courts' issuance of a new policy. In August 2014, just after Odyssey and OMS went live, the Courts issued a policy on 72 Hour Holds. (Dkt. 116-1.) That policy explains how the new system would handle cases where the Prosecutor's Office

obtained permission from the Courts for a seventy-two-hour period in which to make a charging decision.

Plaintiffs' own witness supports Defendants' position the MCSO did not have a policy of holding inmates for 72 hours whether necessary or not. John Thompson is a long-time Indianapolis bail bondsman. Thompson testified that after the move to Odyssey, the Prosecutor sought many more 72-hour continuances (Supp. App. 7, deposition of Mark Thompson, 35:13-25), thus perhaps creating the false impression with inmates that the MCSO had decided to hold inmates for longer times. Finally, Plaintiffs presented no evidence showing that Defendants were motivated to create and enforce a seventy-two-hour policy for the purpose of incarcerating arrestees longer. To the contrary, the undisputed evidence showed that the Sheriff's Office has every incentive to move inmates out of the Jail promptly due to cost and space limitations.

Argument

## A.  Standard of Review

Rule 23(f) of the Federal Rules of Civil Procedure gives this Court discretion to permit an appeal from an order of a district court granting or denying class certification. In interpreting Rule 23(f), this Court has identified three factors that should guide the exercise of its discretion. *Blair v. Equifax Check Servs., Inc.*, 181 F.3d 832, 834–35 (7th Cir. 1999). First, interlocutory review of the denial of class certification may be appropriate when "the denial of class status sounds the death knell of the litigation, because the representative plaintiff's claim is too small to justify the expense of litigation." *Id.* at 834. Second, interlocutory review of the grant of class certification may be appropriate when class certification puts considerable pressure on a defendant to settle, even though the plaintiff's probability of success is slight. *Id.* Third, interlocutory review may be appropriate when "an appeal may facilitate the development of the law." *Id.* at 835.

7

None of the three relevant factors is present in this case. First, the class-certification order does not sound the death knell of this case because the district court certified two of Plaintiffs' proposed subclasses, and Plaintiffs have a claim for attorneys' fees. Thus, the litigation will continue whether this Court reviews the class-certification order now or after entry of final judgment. The second factor is not relevant to this case because it is Plaintiffs who seek interlocutory review. The third factor also is not relevant because, as explained below, the district court's denial of class certification for some of Plaintiffs' proposed subclasses is based on well-established Supreme Court and Seventh Circuit precedent. This case does not present an occasion to develop new law.

**B. The United States Supreme Court established a bright-line test for over-detention claims that generally bars class action claims alleging delays in processing inmates for release from jail.**

In *Gerstein v. Pugh*, 420 U.S. 103 (1975), the Supreme Court focused on the Fourth Amendment's "rule of probable cause," explaining that it is "a practical, nontechnical conception affording the best compromise that has been found for accommodating [two] often opposing interests"—"protecti[ng] against unfounded invasions of liberty and privacy," while "giv[ing] fair leeway for enforcing the law in the community's protection." *Id.* at 112. The Court also explained that "if the Fourth Amendment is to furnish meaningful protection from unfounded interference with liberty," "the detached judgment of a neutral magistrate is essential" in determining the existence of probable cause. *Id.* at 114. In this regard, the Court observed that while "requiring a magistrate's [determination of probable cause] prior to any arrest ... would constitute an intolerable handicap for legitimate law enforcement," *id.* at 113, "the reasons that justify the dispensing with the magistrate's neutral judgment evaporate" once the arrestee is in custody. I*d.* at 114. In light of

these practicalities, the Court explained, "a police [officer]'s on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of a crime, and for a brief period of detention to take the administrative steps incident to arrest," but "the Fourth Amendment requires a judicial determination of probable cause as a prerequisite to extended restraint of liberty." *Id.* at 113-14. "[T]his [judicial] determination must be made ... promptly after arrest." *Id.* at 125.

*Gerstein* did not specify what constitutes a "brief period" of detention for processing, or what constitutes a "prompt[]" judicial determination of probable cause necessary to extend that detention. Sixteen years later, in *County of Riverside v. McLaughlin*, 500 U.S. 44 (1991), the Court acknowledged that *Gerstein*'s "vague standard simply has not provided sufficient guidance," but "has led to a flurry of systemic challenges to city and county practices, putting federal judges in the role of making legislative judgments and overseeing local jailhouse operations." *Id.* at 56. The Court determined that it should "articulate more clearly the boundaries of what is permissible under the Fourth Amendment ... to provide some degree of certainty so that States and counties may establish procedures with confidence that they fall within constitutional bounds." *Id.* The Court confirmed that "'state systems of criminal procedure vary widely' in the nature and number of pre-trial procedures they provide," and that "'flexibility and experimentation by the States' ... was desirable," *id.* at 53 (quoting *Gerstein*, 420 U.S. at 123), particularly with respect to coordinating "'probable cause determinations'" with "'setting bail or fixing other conditions of pretrial release,'" *id.* at 54 (quoting *Gerstein*, 420 U.S. at 124). And the Court further recognized that "the police [must] cope with the everyday problems of processing suspects through an overly burdened criminal justice system." *Id.* at 55.

Thus, the Court held that unless the government detains arrestees longer than 48 hours without providing a judicial probable cause determination, it is "immune from systemic challenges." *Id.* at 56. As for individual claims, the Court held that unless an arrestee is detained longer than 48 hours without a judicial probable cause determination, he can prevail on a Fourth Amendment detention claim only if he proves that the government "delayed unreasonably" in processing him after his arrest due to, for example, an impermissible "purpose" or "motiv[e]." *Id.* And, with the burden of proof on that issue thereby residing with the arrestee, courts "[i]n evaluating whether the delay in a particular case is unreasonable ... must allow a substantial degree of flexibility" to the government and "cannot ignore the often unavoidable delays" in post-arrest processing occasioned by the "practical realities." *Id.* But where an arrestee is detained longer than 48 hours without a judicial probable cause determination, "the burden shifts to the government to demonstrate the existence of a bona fide emergency or other extraordinary circumstance." *Id.* at 57. Subsequently, in *Atwater v. City of Lago Vista*, 532 U.S. 318 (2001), the Court held that *McLaughlin* applies to all persons arrested without a warrant on any charge, "whether for felony or misdemeanor." *Id.* at 352.

### C. This Court's decisions involving over-detention claims foreclose Plaintiffs' request for class certification in this case.

#### 1. *This Court's precedents have applied* McLaughlin *to cases such as this one.*

This Court has held several times that *McLaughlin* governs the propriety of the detentions of warrantless arrestees who are released without a judicial probable cause determination no less than those who are given such a determination. *See Chortek v. City of Milwaukee*, 356 F.3d 740, 746-48 (7th Cir. 2004) (applying *McLaughlin* to hold that periods of detention ranging from three to 14 1/2 hours, for 15 warrantless arrestees released without judicial probable cause determinations, did

not violate the Fourth Amendment); *Bostic v. City of Chicago*, 981 F.2d 965, 968 (7th Cir. 1992) (applying *McLaughlin* to hold that the period of almost 48 hours that a warrantless arrestee was detained before being released without a judicial probable cause determination did not violate the Fourth Amendment).

> ### 2. *This Court's decisions in* Harper *and* Portis *show why class certification is inappropriate in this case.*

In *Harper v. Sheriff of Cook County*, 581 F.3d 511 (7th Cir. 2009), this Court reversed the grant of class certification because each claim of unlawful detention had to be evaluated individually. *Id.* at 515 ("whether the length of the delay between the time the Sheriff was notified that bond had been posted and the time that the detainee was released was reasonable in any given case"). These were individual issues that depended on how long each detainee was held after bond was posted and the particular justifications for any delay. Thus, liability in each case turned on individual determinations. *See Lewis v. O'Grady*, 853 F.2d 1366, 1370 (7th Cir. 1988) (what is a reasonable time for detaining prisoner after grounds for detention have ceased depends on facts presented in each case).

This Court reaffirmed *Harper* a year later, applying the same logic to overturn certification of a class of individuals detained for more than two hours after being arrested for non-jailable offenses. In *Portis v. City of Chicago*, this Court held that the district court erred in prescribing a two-hour limit to this process, and plaintiffs need to show "that any particular detention was excessive." 613 F.3d 702, 703 (7th Cir. 2010). "Because reasonableness is a standard rather than a rule, and because one detainee's circumstances differ from another's, common questions do not predominate and class certification is inappropriate." *Id.*

*Harper* and *Portis* foreclose class certification of the Plaintiffs' claims. Common questions do not predominate where the core complaint raised is the length of detention because the recognized constitutional principles require evaluating any extended detention on a case-by-case basis. *See McLaughlin*, 500 U.S. at 56-57 (holding that delay of more than 48 hours is presumed unreasonable and must be justified by the government, but delay of 48 hours or less is presumed reasonable); *Gramenos v. Jewel Companies, Inc.*, 797 F.2d 432, 437 (7th Cir. 1986) ("It is premature to say how long is too long under the fourth amendment. ... [T]he police should explain what must be done after an arrest ... and why reasonably diligent officers need more than four hours to do it."). In contrast, common questions often will predominate—and class certification could be appropriate—when the case presents questions regarding the constitutionality of the conditions rather than the length, of confinement. *See, e.g., Dunn v. City of Chicago*, 231 F.R.D. 367, 377 (N.D. Ill. 2005) ("Courts routinely address conditions of confinement claims in class actions."). Here, Plaintiffs clearly state that the length of detention is the gravamen of their case. (Pet. to App., p. 3 ("[T]he Marion County Sheriff follows certain policies and practices which result in unusually long and unreasonable periods of detentions for persons whom the Sheriff no longer has legal authority to detain.")).

> 3. *The district court properly interpreted* McLaughlin *as a general bar to Plaintiffs' request for class certification and that interpretation is consistent with this Court's decisions in* Harper *and* Portis.

The Supreme Court established a bright-line rule in *McLaughlin* because *Gerstein's* reasonableness standard gave too little guidance to state and local officials about how much time was reasonable for processing offenders for release and because it resulted in the federal courts

becoming *de facto* jail administrators by dictating what procedures should be used to process inmates. *McLaughlin*, 500 U.S. at 55-56.

Plaintiffs challenged the district court's reliance on *McLaughlin* by arguing that since *McLaughlin* applied only to the length of an inmate's initial detention after arrest and before his first judicial hearing, the case has no application here. (Pet. for App., p. 15.) This argument ignores this Court's post-*McLaughlin* case law extending that decision to other kinds of detentions. Specifically, *Harper* and *Portis* both involved claims that the time between an inmate's eligibility for release and his actual release by a jail took too long—the exact claim at issue here. In both cases, this Court relied upon *McLaughlin* in rejecting the request for class certification.

Furthermore, the policy justifications supporting the Supreme Court's *McLaughlin* decision support application of that rule here. The Supreme Court imposed the 48-hour rule for detention times because after *Gerstein*, the federal courts were inundated with class-action claims from inmates who claimed that their initial detentions were unreasonably long. The Court expressed its concern in *McLaughlin* that these cases put the federal courts in the position of supervising jails and making legislative judgments about how jail processing procedures should work. *McLaughlin*, 500 U.S. at 56. Plaintiffs' suggestion that the 48-hour rule should not apply to cases such as this one is an invitation to a case-by-case determination of the reasonableness of the operations of individual jails and the very sort of federal court supervision of legislative decisions that the Supreme Court rejected in *McLaughlin*.

Of course, this does not leave the Plaintiffs without remedies. *McLaughlin* still allows for inmates to challenge their detentions on an individual basis. Further, even class actions can in some instances still proceed, but only those alleging detention times for a class of 48 hours or

13

more. Plaintiffs' invitation to this Court to reject the Supreme Court's methodology for determining whether over-detention claims can proceed on a class-wide basis should not be accepted.

Because the district court's decision to apply *McLaughlin's* 48-hour rule was correct, its decision to deny certification was correct as well. As the district court explained, Plaintiffs' proposed class includes *all* inmates who claim to be over-detained because their detention times were unreasonable. Thus, the proposed class definition is fatally flawed because it sweeps in those inmates who were held for less than 48 hours as well as those held longer. By including those inmates who are barred from proceeding as a class with those inmates who could possibly proceed as a class under *McLaughlin*, the class definition was improper, and the district court acted within its discretion by rejecting it.

### D. Plaintiffs cannot shoehorn their class claims into the narrow exception for class actions where the length of inmate detentions are at issue.

*McLaughlin* does not preclude class actions where the length of delay extends beyond a 48-hour period. Consistent with that decision, this Court has suggested that a class action could proceed where "a jurisdiction had adopted a policy of deliberate delay." *Portis*, 613 F.3d at 705-06. Here, Plaintiffs attempt to establish such a claim of deliberate delay by theorizing about an alleged, unwritten policy maintained by the Sheriff to hold inmates for up to 72 hours regardless of whether circumstances necessitated doing so. As noted in the previous section, the district court rejected this contention because the proposed class included all of those inmates who were the subject of alleged delays, not just those who were held for more than 48 hours. That decision was correct.

However, there is another problem with Plaintiffs' *Monell* claim—Plaintiffs produced no admissible evidence to support it.[3] Plaintiffs have not identified any of Defendants' employees who supposedly said it. Instead, Plaintiffs offer only inadmissible hearsay that they heard unnamed Sheriff's employees refer to it. Second, even if a low-level employee such as a jail deputy or clerk did say such things, those employees' statements cannot create municipal policy for purposes of Section 1983. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478-80 (1986). Thus, any statement by a low-level Sheriff's employee cannot establish Defendants' policy.[4]

Instead, the formal, written policies of the MCSO control here. In that regard, the Sheriff—who is the final policymaking authority for the MCSO—put in writing the MCSO's policy in a directive issued to all employees after this lawsuit was filed. That directive stated that no 72-hour policy ever existed and that inmates were to be released as soon as they can be timely processed.

Two of Plaintiffs' own witnesses support the Defendants' position. John Thompson and Byron Frierson are long-time Indianapolis bail bondsman. Both of them testified that the problem of longer processing times began in the Summer of 2014 when the new computer systems came online, thus undercutting a claim that the Sheriff had some long standing 72-hour practice. (Dkt. 73-2, Declaration of Byron Frierson, ¶ 6; Supp. App. pp. 7; 8, Deposition of Mark Thompson, 62:25; 63:1-5.) Thompson further testified that the introduction of the new "miscellaneous case"

---

[3]The district court stated that it was prohibited from reaching the question of whether the policy existed because doing so would involve an exploration of the merits. (Dkt 171, p. 9.) Defendants disagree. The district court must conduct a "rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Davis v. Hutchins*, 321 F.3d 641, 649 (7th Cir. 2003). The "rigorous analysis" standard requires a district court to resolve disputed factual questions that bear on the Rule 23 requirements, even if a particular factual question (such as whether there is evidence supporting the existence of a policy under *Monell*) may overlap somewhat with the merits. *Wal-Mart Stores, Inc. v. Dukes,* 564 U.S. 338, 3512-52 (2011).

[4]Again, Plaintiffs' testimony that they heard some unnamed correctional officers refer to a 72-hour policy is inadmissible hearsay. Therefore, Plaintiffs cannot rely upon it to support their claims.

process, caused much confusion and affected processing times.[5] Thompson also explained that after the move to Odyssey, the Prosecutor sought many more 72-hour continuances. (*Id.*) Neither witness identified any sort policy or custom established by the Defendants regarding 72-hour holds.

Finally, Plaintiffs can point to no evidence showing that the Defendants were motivated to create and enforce a seventy-two-hour policy for the purpose of incarcerating arrestees longer. The Marion County Jail operated under a federal consent decree for 35 years because of over-population. The MCSO and its criminal justice partners worked long and hard to make the necessary changes to obtain the decree's termination. That included constructing an Arrestee Processing Center, increasing the size of the Jail staff, and implementing countless policy and programming changes.

These efforts undercut Plaintiffs' unsubstantiated claim that Defendants wanted some blanket policy allowing them to hold inmates for seventy-two hours whether it was necessary or not. Such a practice would only increase costs and cause the Jail population to increase, which could invite a return to federal oversight of the Jail.

### E. The district court correctly denied class certification on the claim that the Defendants utilized a computer system that was unable to timely process inmates for release.

Finally, Plaintiffs allege that the district court abused its discretion in refusing to grant class certification on the claim that the new Odyssey/OMS system was inadequate to process inmate releases. As Defendants have already shown, this claim cannot proceed as a class action because individual questions predominate over any class questions. Whether any individual inmate was or

---

[5] Before the 2014 changes, JUSTIS and JIMS relied upon a system of inmate "gallery" numbers. Those numbers were assigned to arrestees and followed them through their stays at the Jail. All criminal charges against an arrestee were tied to the inmate by that gallery number. In that respect, a gallery number was a unique identification number similar to a social security number. Marion County's Odyssey system was not designed to use Marion County's gallery number system, and it had to be eliminated. (Dkt. 121, ¶ 8.)

was not subject to an unreasonably long detention—and if so, where the fault may lie—has to be determined on a case-by-case basis, making class certification inappropriate. As the district court further explained, members of the proposed class are not identifiable on a class-wide basis given these problems, making certification improper. (Dkt. 171, p. 12.[6])

> 1. *Class certification was properly denied because Plaintiffs did not present evidence sufficient to establish the existence of an unconstitutional policy or practice.*

In addition to the fact that the subclass, as proposed, includes those claiming unreasonably long detentions of 48-hours or less contrary to *McLaughlin*, the district court identified another problem with this part of Plaintiffs' theory—it does not present a "policy or practice from which this subclass can be anchored." (Dkt. 171, p. 12.)

To find the Defendants liable under such a theory, Plaintiffs must establish either that the decision to replace JUSTIS and JIMS with Odyssey and OMS was unconstitutional or that the decision to use this new system was designed and implemented in order to violate the rights of the class. Plaintiffs did not establish these facts.

First, a single decision by a governmental entity—here a decision to replace JIMS with OMS—that results in a plaintiff's harm generally does not rise to the level of a municipal policy. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985); *see also Hvorcik v. Sheahan*, 847 F.Supp. 1414, 1423–25 (N.D. Ill. 1994) (holding that sheriff's "policy" of not removing old arrest warrants from a computer system used to track warrants did not cause the arrest of the individual plaintiffs).

---

[6] To circumvent this problem, Plaintiffs argue that the Sheriff admitted in his deposition the existence of constitutional violation when he testified that release times of greater than 24 or 48 hours would not be reasonable given his expectations for how quickly his employees should process inmates for release. However, the Sheriff actually testified repeatedly that whether a particular detention was too long would depend on the facts and circumstances faced by the Jail in a particular case. (Supp. App., 2-4, Deposition of Sheriff Layton, 8:1-25; 28:1-25; 29:1-4.) Thus, the Sheriff's testimony was not an admission and was entirely consistent with the general principles outlined in *McLaughlin*, *Harper*, and similar cases.

Here, the decision to replace JUSTIS (and to accelerate the implementation) was not even a decision made by the Defendants, but by the Courts.

Second, because the "policy" to replace JIMS with OMS was not itself unconstitutional, considerably more proof than a single unconstitutional incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation. *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823–24 (1985).

Neither the Plaintiffs nor the Defendants have been able to identify the number of inmates who may have been detained more than 48-hours after a court ordered their releases. In part, that is because the parties have not identified a way to determine hold times for all of the inmates held during the class period short of conducting an individualized review of each inmate's detention.

However, other facts are known. Marion County processes approximately 30,000 inmates per year. (Dkt. 120, Dezelan Dec., ¶ 5.) For the 4 years covered by this case , that yearly average amounts to approximately 120,000 inmates. Out of that number, Plaintiffs have identified 61 inmates who claim to be potential class members (with the actual number of over-detentions from that list likely to be far less).[7]  Even if all the inmates who have come forward were actually over-detained, these numbers suggest that 99.995% of all inmates were still processed timely during the class period. These numbers fall woefully short of demonstrating a widespread, unconstitutional practice under *Monell* and *Tuttle*. This tiny fraction of inmates processed at the Jail who claim to have been over-detained, combined with the almost impossible task of individually reviewing over one hundred

---

[7]Fifty-six (56) former inmates provided affidavits in support of the motion for class certification. (Dkt. 73-12.) Including the five (5) class representatives, only sixty-one (61) former inmates have come forward despite the extensive publicity on television and in news articles about this case and despite Plaintiffs' counsel's efforts to identify class members.

thousand offenders to see if their detention times were unreasonable, demonstrates that a class action is the wrong procedural vehicle for the Plaintiffs to prosecute their claims.

>    2.   *Even if this Court determines that the decision to move to Odyssey and OMS amounted to a custom or policy under Monell, Plaintiffs failed to present sufficient evidence of intent.*

Finally, Plaintiffs failed to produce sufficient evidence that the decision to move to Odyssey and OMS was itself a decision made with deliberate indifference to inmate rights. On this point, Plaintiffs offer two arguments. First, they note that the Sheriff's Chief Information Officer, who was hired from the Courts' own IT staff many months after the problems with Odyssey and OMS came to light, thought the Sheriff should consider moving from OMS to another case management system. (Pet. to App., p. 13.)

This fact, however, proves nothing. This evidence does not show that the Sheriff or anyone involved in advising the Sheriff on which system to choose was deliberately indifferent to inmate needs *at the time the decision to go with OMS was made.* Additionally, the IT professionals involved in this decision believe that OMS and Odyssey are now fully integrated. (Supp. App., 15, Deposition of Geneva Roembke, p. 47.) This argument that using 20/20 hindsight, some personnel believed in 2014 or 2015 that OMS should be replaced sounds, at most, in negligence. Even gross negligence is not a foundation for a Section 1983 claim. *Lewis v. Anderson*, 308 F.3d 768, 773 (7th Cir. 2002).

Second, Plaintiffs' argument ignores the fact that IT staff from the County and the Courts were consulted about whether to move to OMS as part of the Odyssey changeover, and no objections were raised. As Plaintiffs themselves point out, the Courts' IT director, when consulted by the Sheriff's staff about possibly using OMS to replace JIMS said, "if [OMS is] what you want to go with, you know, we'll figure a way out to send information to you." (Dkt. 158-15, Thamba

Depo. 89.)  No doubt that was in part because a "gap analysis" was performed to confirm that OMS would be a sufficient replacement for JIMS.  These facts defeat any assertion that the collective decision of the Defendants to move to OMS was deliberately indifferent to inmate rights.  This conclusion is independent support for the district court's conclusion to reject class certification on the computer issues.

### Conclusion

Plaintiffs' request to appeal this case now should be denied.  Instead, the case should proceed as to those classes certified by the district court, and a final review can be conducted once the case is fully concluded.

FROST BROWN TODD LLC

By:  s/*Anthony W. Overholt*
    Anthony W. Overholt, #16481-49

    Attorneys for Defendants - Respondents
    Marion County Sheriff and The
    Consolidated City of Indianapolis and
    Marion County

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 1, 2016, a copy of the foregoing document was filed electronically. Service of this filing will be made on all ECF-registered counsel by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/Anthony W. Overholt
_____
Anthony W. Overholt

FROST BROWN TODD LLC
201 North Illinois Street, Suite 1900
P.O. Box 44961
Indianapolis, IN  46244-0961
317-237-3800
Fax: 317-237-3900
aoverholt@fbtlaw.com

LR02314.0629431   4834-8937-4523v1

21

Appeal No. 16-8024

UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

**MICHAEL DRIVER, TERRY CLAYTON, MICHAEL BOYD,
NICHOLAS SWORDS, and, ROY SHOFNER,**
individually and on behalf of all others similarly situated,
Plaintiffs – Petitioners
v.

**THE MARION COUNTY SHERIFF, and,
THE CONSOLIDATED CITY OF INDIANAPOLIS AND MARION COUNTY**
Defendants – Respondents

On Petition for Permission to Appeal from the
U.S. District Court, Southern District of Indiana, Indianapolis Division,
Case No. 1:14-cv-2076-RLY-MJD
Honorable Richard L. Young, Judge

**DEFENDANTS-RESPONDENTS' SUPPLEMENTAL APPENDIX**

Anthony W. Overholt
FROST BROWN TODD LLC
201 North Illinois Street, Suite 1900
P.O. Box 44961
Indianapolis, IN  46244-0961
317-237-3800
Fax: 317-237-3900
aoverholt@fbtlaw.com

John Layton
December 8, 2015

```
          IN THE UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF INDIANA
                INDIANAPOLIS DIVISION
            CAUSE NO. 1:14-cv-2076 RLY-MJD

MICHAEL DRIVER, TERRY CLAYTON,   )
MICHAEL BOYD, NICHOLAS SWORDS,   )
and ROY SHOFNER, individually    )
and as representatives of a      )
class of all similarly situated )
individuals,                     )
                                 )
             Plaintiffs,          )
                                 )
               -vs-              )
                                 )
THE MARION COUNTY SHERIFF, and   )
THE CONSOLIDATED CITY OF         )
INDIANAPOLIS AND MARION COUNTY,  )
                                 )
             Defendants.          )
```

DEPOSITION OF

SHERIFF JOHN LAYTON

     The deposition upon oral examination of
SHERIFF JOHN LAYTON, a witness produced and sworn
before me, Jenny L. Reeve, RPR, CSR No. 00-R-3006,
a Notary Public in and for the County of Hamilton,
State of Indiana, taken on behalf of the
Plaintiffs, at the offices of Frost Brown Todd, 201
North Illinois Street, Suite 1900, Indianapolis,
Marion County, Indiana, on the 8th day of December,
2015, at 12:34 p.m., pursuant to the Federal Rules
of Civil Procedure, all applicable rules, all
stipulations, if any, and pursuant to notice and/or
agreement and/or subpoena as to time and place
thereof.

**John Layton**
**December 8, 2015**

Page 8

```
 1   Q   Does that also seem fair?
 2   A   Yes, uh-huh.
 3   Q   Okay.  What have you done, if anything, to kind
 4       of get a handle on the numbers that are
 5       associated with those terms, the release times?
 6       What is a reasonable release time in Marion
 7       County?
 8   A   Well, there is no -- there's no policy.  There's
 9       nothing of that nature.  It's however long it
10       takes us to process that person out the door.
11           And depending on the day of the week,
12       depending on the type of charges, depending on
13       each and every inmate's background and jacket,
14       so to speak -- we have what we call a jacket
15       with different holds.  And there's so many
16       different things that can hold up the release of
17       that inmate as quick as we would like to have it
18       done.
19   Q   What -- do you have an understanding,
20       historically, what the period of release time in
21       Marion County has been?
22   A   No.  There's really no set time.  There's --
23       there's no -- there's nothing in stone.  There's
24       nothing in writing as to how long it actually
25       takes, because they're like snowflakes.  Every
```

**John Layton**
**December 8, 2015**

Page 28

```
 1    paperwork, because if the allegation is that he
 2    was being held longer than he should have, and
 3    then suddenly, the Court sent over some other
 4    paperwork, that gets to the crux of some of
 5    these problems.
 6         I don't know if you follow me yet, but, you
 7    know, the crux of most all of these problems was
 8    an IT problem.  So if the original IT was not
 9    proper, he wouldn't have gone out the door.
10         Then, if the Court had to, a second time,
11    contact the sheriff's office, giving them the
12    proper information, then, at that point, it
13    would take an hour.
14  Q  And that would seem reasonable, I take it, to
15     you, that taking an hour to process somebody out
16     once you got a proper order from the Court --
17  A  Oh, absolutely.
18  Q  -- saying to release that person --
19  A  To me that would be reasonable.
20  Q  And that would be kind of consistent with the
21     standard of what you would see as reasonable in
22     releasing inmates once you got a proper order to
23     release them?
24         MR. OVERHOLT:  I'll object to the form of
25     the question.
```

**John Layton**
**December 8, 2015**

1          **But the witness can answer.**

2    A    Again, it depends on what's in that packet to

3          each individual inmate.  They're all different

4          in one way or another.

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF INDIANA
 2                   INDIANAPOLIS DIVISION


 3


 4    MICHAEL DRIVER, et al.,        )
                                     )
 5               Plaintiffs,         )
                                     )
 6          -v-                      ) CASE NO.
                                     ) 1:14-CV-02076-RLY-MJD
 7    THE MARION COUNTY SHERIFF,     )
      et al.,                        )
 8                                   )
                 Defendants.         )

 9


10


11


12          The deposition upon oral examination of

13    MARK THOMPSON, a witness produced and sworn before me,

14    Laurie Morgan, RPR, Notary Public in and for the

15    County of Marion, State of Indiana, taken on behalf

16    of the Defendants at the offices of Frost Brown Todd,

17    201 North Illinois Street, Suite 1900, Indianapolis,

18    Indiana, on November 19, 2015, at 9:03 a.m., pursuant

19    to the Federal Rules of Civil Procedure.

20


21


22
                  STEWART RICHARDSON & ASSOCIATES
23               Registered Professional Reporters
                      One Indiana Square
24                        Suite 2425
                   Indianapolis, IN  46204
25                      (317)237-3773
```

```
 1                        APPEARANCES

 2
    FOR THE PLAINTIFFS:
 3  MICHAEL DRIVER, et al.

 4        John P. Young, Esq.
          Matthew C. Boldt, Esq.
 5        YOUNG & YOUNG
          128 North Delaware Street
 6        Third Floor
          Indianapolis, IN  46204
 7
          Richard A. Waples, Esq.
 8        WAPLES & HANGER
          410 North Audubon Road
 9        Indianapolis, IN  46219

10
    FOR THE DEFENDANT:
11  MARION COUNTY SHERIFF

12        Anthony W. Overholt, Esq.
          FROST BROWN TODD, LLC
13        1900 Capital Center South
          201 North Illinois Street
14        Indianapolis, IN  46204

15
    FOR THE DEFENDANT:
16  CITY OF INDIANAPOLIS

17        Daniel P. Bowman, Esq.
          OFFICE OF CORPORATION COUNSEL
18        1601 City-County Building
          200 East Washington Street
19        Indianapolis, IN  46204

20

21

22

23

24

25
```

```
 1   A   Right.
 2   Q   And you've got the other case numbers; is that
 3       right?
 4   A   Everybody is on a 72-hour continuance.  Everybody.
 5       So you get a miscellaneous case number.  And then
 6       they give the prosecutor 72 hours to decide whether
 7       they -- they go, Well, we'll file charges or not
 8       file charges.
 9           And if they file charges, you go to court,
10       then they give you a real case number, and then
11       they give you some charges.  And whether the stuff
12       gets transferred over, you know...
13   Q   So after July of 2014, there was a big increase in
14       the number of instances where the prosecutor
15       exercised his 72-hour hold powers; right?
16   A   Everybody.  Everybody.
17   Q   So now everybody has the 72-hour while they --
18   A   Not a hold, continuance.
19   Q   Continuance.  While they figure out what to do; is
20       that right?
21   A   Yes.  And an MC case number.
22   Q   Okay.
23           (Defendants' Exhibit 10 was marked for
24       identification.)
25   Q   I just handed you what's been marked as Exhibit 10.
```

```
 1      they got released.  Was it cash bond, OR,

 2      10 percent, bail bond, how many FTAs there were,

 3      and I did that by years.

 4  Q   You were trying to survey that information?

 5  A   I've been doing it for about seven years, and I

 6      wanted a 10-year run on it, so I could see.

 7          But when the judges wanted to go to a

 8      revenue-generating system, the FTA rate

 9      skyrocketed, in the tens of thousands actually, and

10      they quit giving me the data.

11          So, therefore, they used -- the transition,

12      they used it as a way to say, We can't give you

13      that information, we're going through this

14      transition.

15  Q   Earlier you talked about CCA.

16  A   Uh-huh.

17  Q   Is it your understanding that CCA has its own

18      policies and practices that uses the jail too?

19  A   No.  I have no ideal.  I mean, they're a private

20      company, so I imagine they do.

21  Q   But you have no personal knowledge of how CCA runs

22      Jail II?

23  A   No, just from what I see, just from what I

24      experienced, my own experiences in it.

25  Q   Is it safe to say you have no personal knowledge of
```

```
 1      why these alleged over-detentions increased in June
 2      or July of 2014?
 3   A  It just all correlated with the MyCase coming
 4      online and the problems they were having, it
 5      increased confusion.
 6   Q  You don't have personal knowledge, though, of what
 7      was going on with those?
 8   A  Behind the scenes?
 9   Q  Yeah.
10   A  No, not behind the scenes.  I can only tell you
11      upfront what I was seeing and what was happening.
12   Q  Okay.  So all you can say is, at some point in
13      time, in your personal experience, it appears as if
14      people spent more time in the jail than they used
15      to?
16   A  Before they got released, yes.
17         MR. BOWMAN:  I don't have any further
18      questions.
19         MR. YOUNG:  Let's take a break.
20         (A brief recess was taken.)
21         MR. OVERHOLT:  Before we start, I want to ask
22      him some additional questions.
23   DIRECT EXAMINATION (CONTINUING)
24   BY MR. OVERHOLT:
25   Q  What did you guys just talk about in the room over
```

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF INDIANA
 2                   INDIANAPOLIS DIVISION

 3              CAUSE NO. 1:14-cv-2076 RLY-MJD

 4   MICHAEL DRIVER, TERRY CLAYTON,   )
     MICHAEL BOYD, NICHOLAS SWORDS,   )
 5   and ROY SHOFNER, individually    )
     and as representatives of a      )
 6   class of all similarly situated  )
     individuals,                     )
 7                                    )
             Plaintiffs,              )
 8                                    )
                 -vs-                 )
 9                                    )
     THE MARION COUNTY SHERIFF, and   )
10   THE CONSOLIDATED CITY OF         )
     INDIANAPOLIS AND MARION COUNTY,  )
11                                    )
             Defendants.              )
12

13

14           DEPOSITION OF DEREK M. PETERSON

15

16        The deposition upon oral examination of
     DEREK M. PETERSON, a witness produced and sworn
17   before me, Diane Zeyen, RPR, a Notary Public in and
     for the County of Hamilton, State of Indiana, taken
18   on behalf of the Plaintiffs, at the offices of
     Connor Reporting, 111 Monument Circle, Suite 4350,
19   Indianapolis, Marion County, Indiana, on the 2nd day
     of May, 2016, at 9:41 a.m., pursuant to the Federal
20   Rules of Civil Procedure with written notice as to
     time and place thereof.
21

22

23

24

25
```



Derek Peterson
May 02, 2016

2

2

```
 1                  A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFF(S):

 4             Richard A. Waples
               WAPLES & HANGER
 5             410 North Audubon Road
               Indianapolis, IN  46219
 6             317.357.0903
               rwaples@wapleshanger.com
 7
               and
 8
               John P. Young
 9             YOUNG & YOUNG
               128 North Delaware Street
10             3rd Floor
               Indianapolis, IN 46204
11             317.639.5161
               john@youngandyoungin.com
12

13

14    FOR THE DEFENDANT(S):

15             Anthony W. Overholt
               FROST BROWN & TODD
16             201 North Illinois Street
               Suite 1900
17             Indianapolis, In  46204
               317.237.3800
18             aoverholt@fbtlaw.com

19

20

21

22

23

24

25
```



1       JIMS?

2    A    To replace JIMS.

3    Q    What about the decision of what to select in

4         replacement of JIMS?

5    A    ISA was at the table during discussions of what

6         to replace JIMS with.

7    Q    You weren't at that table, I take it?

8    A    Correct.

9    Q    This is what you have heard afterwards?

10   A    Correct.

11   Q    Did you hear anybody specifically say that ISA

12        recommended OMS to the Sheriff's Department?

13   A    Not that I recall.

14   Q    Are you aware of any vetting that ISA did with

15        respect to OMS?

16   A    I believe there was a gap analysis performed

17        where they returned back various items that were

18        going to have to be programmed in OMS to make

19        the application work better for the Sheriff's

20        Office.

21   Q    And was that gap analysis an analysis of OMS as

22        compared to JIMS or was it a gap analysis of OMS

23        as it might be compatible or incompatible with

24        Odyssey?

25   A    It was OMS to JIMS.



1                  IN THE UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF INDIANA
2                     INDIANAPOLIS DIVISION

3

4    MICHAEL DRIVER, TERRY      )
     CLAYTON, MICHAEL BOYD,     )
5    NICHOLAS SWORDS, and       )
     ROY SHOFNER,               )
6    individually and as        )
     representatives of a       )
7    class of all similarly     )
     situated individuals,      )
8                               )
          Plaintiffs,           )
9                               )
               vs.              )
10                              )
     MARION COUNTY SHERIFF      )
11   and THE CONSOLIDATED       )
     CITY OF INDIANAPOLIS       )
12   AND MARION COUNTY,         )
                                )
13        Defendants.           )

14

15                    The oral deposition of

16                    GENEVA ROEMBKE,

17   taken by counsel for the Plaintiffs on the 3rd day of

18   June, 2016, at 128 N. Delaware Street, Indianapolis,

19   Indiana, before Heather S. Orbaugh, Notary Public in

20   and for the County of Boone, State of Indiana, CCR:

21   LA.

22

23                  ACCURATE REPORTING OF INDIANA
                William F. Daniels, Prop., RPR/CP, CM
24                    12922 Brighton Avenue
                      Carmel, Indiana 46032
25                       (317) 848-0088

```
 1   A P P E A R A N C E S

 2

 3   FOR PLAINTIFFS:

 4   Mr. John P. Young
     YOUNG & YOUNG
 5   128 N. Delaware Street
     Third Floor
 6   Indianapolis, Indiana   46204

 7   Mr. Richard A. Waples
     WAPLES & HANGER
 8   410 Audubon Road
     Indianapolis, Indiana   46219

 9

10   FOR DEFENDANTS:

11   Mr. Anthony W. Overholt
     FROST BROWN TODD, LLC
12   201 N. Illinois Street
     Suite 1900
13   PO Box 44961
     Indianapolis, Indiana   46244-0961
14

15

16

17

18

19

20

21

22

23

24

25
```

Case: 16-8024    Document: 3    Filed: 11/01/2016    Pages: 45

1  to do what needed to be done in order for OMS to get

2  the information?

3  A       Correct.

4  Q       So CORE Dexter had to be developed in a hurry?

5  A       Correct.

6  Q       And is that still an ongoing process?

7  A       Yes.

8  Q       Safe to say that there were quite a few

9  growing pains because CORE Dexter wasn't totally --

10 wasn't ready to go when the other systems went on

11 board?

12 A       Yes.

13 Q       How long did that take or is it still ongoing

14 I guess?

15 A       Still ongoing.

16 Q       They are still not fully integrated, are they,

17 though, Odyssey and OMS?

18 A       They are as fully integrated as requested at

19 this time.

20 Q       When was it that core Dexter kind of went live

21 or -- when was it?

22 A       It went live the same day as Odyssey.

23 Q       Which was what?

24 A       I think July 6 or June 6.

25 Q       June 6 of 2014?

```
 1            IN THE UNITED STATES DISTRICT COURT
                 SOUTHERN DISTRICT OF INDIANA
 2                  INDIANAPOLIS DIVISION

 3            CAUSE NO. 1:14-cv-2076 RLY-MJD

 4   MICHAEL DRIVER, TERRY CLAYTON,  )
     MICHAEL BOYD, NICHOLAS SWORDS,  )
 5   and ROY SHOFNER, individually   )
     and as representatives of a     )
 6   class of all similarly situated )
     individuals,                    )
 7                                   )
                Plaintiffs,          )
 8                                   )
                  -vs-               )
 9                                   )
     THE MARION COUNTY SHERIFF, and  )
10   THE CONSOLIDATED CITY OF        )
     INDIANAPOLIS AND MARION COUNTY, )
11                                   )
                Defendants.          )
12

13                  DEPOSITION OF

14              MAJOR TAMMY WOOD

15        The deposition upon oral examination of
     MAJOR TAMMY WOOD, a witness produced and sworn
16   before me, Jenny L. Reeve, RPR, CSR No. 00-R-3006,
     a Notary Public in and for the County of Hamilton,
17   State of Indiana, taken on behalf of the
     Plaintiffs, at the offices of Frost Brown Todd, 201
18   North Illinois Street, Suite 1900, Indianapolis,
     Marion County, Indiana, on the 8th day of December,
19   2015, at 3:06 p.m., pursuant to the Federal Rules
     of Civil Procedure, all applicable rules, all
20   stipulations, if any, and pursuant to notice and/or
     agreement and/or subpoena as to time and place
21   thereof.

22

23

24

25
```



2

```
1                     APPEARANCES

2

   FOR THE PLAINTIFF(S):
3  Michael Driver, Terry Clayton, Michael Boyd,
     Nicholas Swords, and Roy Shofner, individually and
4    as representatives of a class of all similarly
     situated individuals
5
           Richard A. Waples, Esq.
6          WAPLES & HANGER
           410 N. Audubon Road
7          Indianapolis, IN  46219
           317.357.0903
8          rwaples@wapleshanger.com

9          John P. Young, Esq.
           Matthew C. Boldt, Esq.
10         YOUNG & YOUNG
           128 N. Delaware Street
11         Indianapolis, IN  46204
           317.639.5161
12         john@youngandyoungin.com
           matthew@youngandyoungin.com
13

14  FOR THE DEFENDANT(S):
    The Marion County Sheriff
15
           Anthony W. Overholt, Esq.
16         FROST BROWN TODD LLC
           201 North Illinois Street
17         Suite 1900
           Indianapolis, IN  46204-4236
18         317.237.3800
           aoverholt@fbtlaw.com
19

20  FOR THE DEFENDANT(S):
    The Consolidated City of Indianapolis
21    and Marion County

22         Daniel P. Bowman, Esq.
           INDIANAPOLIS OFFICE OF CORPORATION COUNSEL
23         200 E. Washington Street
           Room 1601
24         Indianapolis, IN  46204
           317.327.4055
25         daniel.bowman@indy.gov
```



77

2   Q   I don't necessarily have them here.

3        But do you have an opinion about that

4        training, or can you explain that training that

5        you received in order to try to implement the

6        new computer systems and make them mesh?

7        MR. OVERHOLT:  I'm going to object to that

8        question.  It asks three separate things.

9        MR. WAPLES:  Complex, not compound.

10  A   Did we train?  Yes, we did.

11  Q   Okay.

12  A   What was your next question?

13  Q   Was that training adequate to really allow jail

14       personnel to effectively, adequately use the

15       system, the computer system?

16  A   Each time there was a change in the system, we

17       trained.  So yes, it was adequate.

18  Q   Okay.  Did you ever have any jail staff that

19       complained that their training was inadequate,

20       they didn't really realize what particular forms

21       were for, and they didn't know what they were,

22       and they -- and that they weren't able to

23       process them adequately?

24  A   What specifically are you going for?  Complain?

25       No.  People always ask questions if it's



Supp. App. 000018

1       something you don't see on a daily basis.

2           So are there questions when something

3       doesn't happen on a repetitive basis?  Yes.

4   Q   Do you know how many hours you were trained on,

5       on the new systems?

6   A   Not off the top of my head, no.

7   Q   How about the people underneath you?  How much

8       training did they receive on the new systems?

9   A   Total?  I don't know.  Every time we had an

10      initial training, and then when there were

11      changes, those changes -- staff were informed

12      about those and trained on those.

